AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
OCT 15 2019

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>White iPhone<br>Seized as FP&F No. 2020565500001603<br>("Target Device #5") | ) ) ) ) ) ) | Case No. **19MJ4521** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-5

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, United States Code § 1324 | Transport Illegal Aliens(a)(1)(A)(ii) and (v)(II) |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Arturo Hernandez, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/15/2019

*Judge's signature*

City and state: San Diego, California    The Honorable Linda Lopez, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Arturo Hernandez, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrant(s) to search the following electronic device(s):

> Alcatel cellphone
> Seized as FP&F No. 2020565500001603
> (**"Target Device #3"**)[1]
>
> Black LG smartphone
> Seized as FP&F No. 2020565500001603
> (**"Target Device #4"**)
>
> White IPhone
> Seized as FP&F No. 2020565500001603
> (**"Target Device #5"**)
>
> Gray TCL Smartphone
> Seized as FP&F No. 2020565500001603
> (**"Target Device #6"**)
>
> Apple Notebook
> Seized as FP&F No. 2020565500001603
> (**"Target Device #7"**)
>
> Samsung Notebook
> Seized as FP&F No. 2020565500001603
> (**"Target Device #8"**)

(the "**Target Devices**"), as further described in Attachment(s) A-3 through A-8, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrants relate to the investigation and prosecution of Daniel ARREDONDO, Nicole Charlene RUTAR and Osvaldo HERNANDEZ for smuggling

---

[1] This Court issued search warrants for Target Devices 1 and 2 (cell phones found with Daniel ARREDONDO and Osvaldo HERNANDEZ) on October 9, 2019. *See* 19MJ4429, 19MJ4430.

1

illegal aliens from Mexico into the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrant(s) and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2014, and am currently assigned to the Campo Border Patrol Station. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for ten years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the

United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to

make smuggling arrangements, receive instructions, and report their locations after crossing.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

   c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

   d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

   e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On October 8, 2019, Supervisory Border Patrol Agent P. Bak-Sklener was performing assigned duties in the Campo Border Patrol Station's area of responsibility. Agent Bak-Sklener was driving an unmarked Border Patrol vehicle equipped with emergency lights and siren. At approximately 10:55 AM, Agent Bak-Sklener observed a white Ford Sports Utility Vehicle (SUV), traveling south on Ribbonwood Road, Boulevard, California, at an extremely slow rate of speed. The vehicle was riding extremely low to the ground as it passed Agent Bak-Sklener's location. Records checks revealed that the vehicle was registered out of Los Angeles, California. Due to the vehicle riding extremely close to the ground and the vehicle being registered out of Los Angeles, with no recent Border Patrol Immigration Checkpoint or international crossings, Agent Bak-Sklener decided to follow the vehicle. After traveling approximately one mile along Old Highway 80 the Ford vehicle took State Route 94 (SR-94) west. The vehicle was traveling at approximately 25 miles per hour, which is well below the posted speed limit. As Agent Bak-Sklener followed the Ford SUV, it appeared as though the rear windows of the vehicle were so dark that they appeared to be painted. As Agent Bak-Sklener was following the SUV he observed that it was traveling very closely behind a U-Haul truck. Agent Bak-Sklener followed the vehicle for approximately thirteen miles. The driver of the Ford SUV, later identified as the defendant Osvaldo HERNANDEZ, was constantly looking is his side view mirror. There were no other vehicles on SR-94 from the time Agent Bak-Sklener began following the vehicle until both the U-Haul and the Ford SUV pulled into Circle K located at the block of 30000 SR-94, Campo, California 91906. HERNANDEZ parked at the eastern most pumps, exited his vehicle, and went inside the Circle K. The driver of the U-Haul, later identified as the defendant Daniel ARREDONDO, parked at the western most pumps and went inside of the Circle K.

HERNANDEZ exited the Circle K, went to his vehicle and moved the Ford SUV to a parking spot in front of the Circle K. ARREDONDO exited the Circle K and returned to his U-Haul. While both subjects were walking to and from their vehicles they repeatedly looked over at Agent Bak-Sklener in his vehicle, which was parked directly across from the Circle K.

12. While observing HERNANDEZ and ARREDONDO, Agent Bak-Sklener requested that dispatch check with the Highway 94 Immigration Checkpoint to find out whether or not it was operational. Border Patrol dispatch reported that the checkpoint was closed. At the time of this event, the Old Highway 80 Immigration Checkpoint and the Interstate 8 Immigration checkpoint were operational, making the Highway 94 checkpoint the only thoroughfare on the way back to the major metropolitan areas without an operational immigration checkpoint. Agent Bak-Sklener lost sight of ARREDONDO for a couple minutes behind the U-Haul. ARREDONDO then emerged from behind the U-Haul and walked over to the Ford SUV speaking with HERNANDEZ for a couple of minutes. After speaking to one another for a couple of minutes, HERNANDEZ moved his Ford SUV to the pumps next to ARREDONDO. The two vehicles then left together. After observing the vehicles for approximately 25 minutes at Circle K, the Ford SUV and the U-Haul turned west on Highway 94 toward San Diego, California, a known smuggling route. At approximately 11:40 AM, Agent Bak-Sklener requested that both vehicles be stopped believing both were being used to smuggle.

13. Border Patrol Agent M. Knott conducted a vehicle stop on the Ford SUV being driven by HERNANDEZ approximately one mile west of Circle K along Highway 94 and Border Patrol Agent L. Smith conducted a vehicle stop on the U-Haul being driven by ARREDONDO. Agent Bak-Sklener pulled up behind Agent Knott's vehicle and approached the Ford SUV with his agency issued badge hanging clearly around his neck. Agent Bak-Sklener identified himself as a Border Patrol Agent and asked which country HERNANDEZ was a citizen of, to which he stated "United States." Agent Bak-Sklener then asked HERNANDEZ where he was traveling to and HERNANDEZ stated Inglewood.

1 Agent Bak-Sklener informed HERNANDEZ that he was traveling in the wrong direction. At this time HERNANDEZ's hands began to shake profusely exhibiting nervousness. Agent Bak-Sklener then requested consent to search the back of the Ford SUV. HERNANDEZ granted consent. Agent Bak-Sklener opened the back of the vehicle and it was empty. Agent Bak-Sklener then asked who the vehicle was registered to and HERNANDEZ provided only a first name that did not match that of the registered owner. Agent Bak-Sklener then asked HERNANDEZ his purpose of travel. HERNANDEZ stated he was gathering the belongings of his deceased grandmother. Agent Bak-Sklener asked if those were the items in the U-Haul to which he responded "yes," confirming that he was in fact traveling in tandem with the U-Haul.

14. While Agent Smith was on the vehicle stop, he determined that ARREDONDO was a citizen of the United States. Agent Smith then asked ARREDONDO what was in the back of the U-Haul and he stated "furniture." Agent Smith requested consent from ARREDONDO to look in the back of the U-Haul. ARREDONDO granted consent to look in the back of the U-Haul. As Agent Smith opened the back he observed nine possible illegal aliens seated in the back. Agent Smith began questioning the nine individuals, later identified as material witnesses Carlos BLAS-Santiago, Francisco JULIAN-Duble, Jeremias KU-Nah, Adan LOPEZ-Guzman, Josua LOPEZ-Guzman, Edith MENDOZA-Gonzalez, Celso RIOS-Quinonez, Jose SANCHEZ-Rosas and Daniel VAZQUEZ-Cante, as to what country they are citizens of. All nine stated separately they were citizens of Mexico. Agent Smith asked all nine, separately, if they had the proper documents to be or remain in the United States legally. All nine stated separately they did not. Agent Smith asked all nine if they knew when they crossed that they crossed illegally into the United States. All nine stated, separately they did know that they crossed illegally. At approximately 11:45 AM, Agent Smith placed all material witnesses under arrest. At the same time Agent Smith placed ARREDONDO under arrest. This location is approximately two miles north of the United States/Mexico International Boundary and ten miles east of the Tecate, California Port of Entry. At approximately 11:45 AM, Agent

7

1 Bak-Sklener received a radio transmission from Agent Smith that the U-Haul was smuggling aliens. Agent Bak-Sklener placed HERNANDEZ under arrest.

15. SBPA Bak-Sklener returned to the U-Haul and observed that the smuggled aliens were being smuggled in the storage compartment of the vehicle. The U-Haul was also full with multiple mattresses, a couch, an old computer monitor and tires. Nothing was strapped down and there were no safety features for the smuggled aliens. There was also no exit from the inside of the U-Haul for the smuggled aliens to exit. Furthermore, none of the smuggled aliens were in possession of a cellular telephone to call for help. The temperature at the time was approximately 85 degrees Fahrenheit.

16. All nine smuggled aliens, HERNANDEZ, ARREDONDO and the two vehicles were transported to the Campo Station for further processing.

17. Post-*Miranda*, ARREDONDO identified a third individual, "Nicole De la Fuente" (later identified as Nicole Charlene RUTAR). ARREDONDO stated that RUTAR stayed at a motel in El Centro with him, HERNANDEZ and the material witnesses the night before his arrest. He identified RUTAR in a photo line-up. He also identified RUTAR's car as a White Mercedes SUV.

18. When interviewed, several of the material witnesses (at least BLAS, KU-NAH, SANCHEZ, VASQUEZ) told agents that a woman confiscated their cell phones while they stayed at a motel in El Centro before loading into the U-Haul. Those witnesses identified RUTAR from a six-pack photo line-up as the person who took their phones.

19. While conducting an inventory of the U-Haul, SBPA Bak-Sklener located a rental receipt with the name "Nicole De La Fuente" as the U-Haul renter and a telephone number. SBPA Bak-Sklener contacted the telephone number on the rental form in order for RUTAR to gather the belongings. RUTAR stated that although she had rented the U-Haul, she gave it to her friend Daniel. SBPA Bak-Sklener asked RUTAR were she was and she stated along Interstate 8 in the mountains. SBPA Bak-Sklener then asked her if she passed the checkpoint. RUTAR answered that she had not. In response to a question, RUTAR answered that she was driving a white Mercedes. SBPA Bak-Sklener asked

RUTAR to come into the station to claim her belongings, since it sounded like she was close to the station. RUTAR stated she did not want to get in trouble and hung up. SBPA Bak-Sklener attempted to call RUTAR a second time but her telephone was turned off.

20. SBPA Bak-Sklener put out a request via DHS radio for all agents to be on the lookout for RUTAR's car.

21. BPA Jorge Medina heard the look-out and recognized the description of the vehicle, because he had run records checks on a vehicle matching that description a couple of days before in relation to another potential smuggling event. Agent Medina relayed the exact vehicle information, a white Mercedes SUV, bearing CA plate 8GGB847, via DHS radio.

22. A couple of hours before receiving SBPA Bak-Sklener's radio transmission, BPA Frederick was informed by El Centro Sector Border Patrol Agents that the white Mercedes SUV (CA 8GGB847) was observed at a motel in El Centro, California, that is commonly used by aliens smugglers to stash illegal aliens.

23. At approximately 1:50 p.m. on that same day, BPA Robert Frederick located the white Mercedes SUV and followed it along Highway 94 taking the same irregular traffic pattern that the U-Haul and Ford SUV took. He requested that a marked vehicle conduct a vehicle stop. SBPA Jorge Franco, who was driving a marked Border Patrol vehicle and was in full rough duty Border Patrol uniform conducted that vehicle stop and placed RUTAR under arrest for violation of Title 8 United States Code 1324 - Conspiracy to commit alien smuggling at approximately 2:10 p.m.

24. During an inventory search of the white Mercedes SUV post-arrest, BPA Bak-Sklener found a black notebook with the words "Master Plan" written on the outside. A search of the notebook revealed the name "Oswaldo Hernandez" written on one of the pages along with the date of birth, "09/10/94." (The name of the driver of White SUV was Osvaldo HERNANDEZ with a date of birth of September 10, 1994.)

25. Agents also located nine phones in RUTAR's SUV. Agents showed all nine phones to the smuggled aliens to determine which phones belonged to the aliens and which

9

1 one(s) belonged to RUTAR. Only VAZQUEZ identified a Black Samsung Galaxy Note 8 (Seized as FP&F No. 2020565500001604) as his phone and provided the pass code to access it. None of the other cell phones were identified by the material witnesses as being their phone. The other eight phones are the **Target Devices** discussed above. As detailed further in the Methodology section below, Border Patrol will search the **Target Devices** to determine which one or ones of these phones belong to RUTAR. Once RUTAR's phone or phones is/are identified amongst the **Target Devices**, Border Patrol personnel will search that phone(s) for items responsive to Attachment B.[2]

26. RUTAR was transported to the Campo Station along with all her belongings for processing.

27. In my training and experience, alien smugglers and transporters are involved in the planning and coordination of alien smuggling event in the days and weeks prior to an event, especially in a situation such as this one, which required coordination amongst multiple drivers, pick-ups and drop-offs in multiple locations, reserving a hotel room and renting a U-Haul. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the aliens. Accordingly, I request permission to search the **Target Devices** for data beginning from **September 8, 2019 through October 10, 2019**.

## METHODOLOGY

28. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data

---

[2] RUTAR invoked her right to counsel when interviewed and was not questioned as to which phone or phones were hers.

10

contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

29. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

30. The personnel conducting identification and extraction of the data will first search the **Target Devices** to determine which one or ones appear to belong to RUTAR. Once the personnel has identified which Target Device(s) belong to RUTAR, they will search those **Target Devices** for items responsive to Attachment B.

31. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

32. Law enforcement has previously attempted to obtain the evidence sought by

this warrant through consent. Consent was not given.

## CONCLUSION

31. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of ARREDONDO's, RUTAR's and HERNANDEZ's violations of Title 8, United States Code, Sections 1324.

32. Because the **Target Devices** were seized at the time of RUTAR's arrests and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**.

33. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the cell phones described in Attachments A-3 through A-8, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Arturo Hernandez
Border Patrol Agent

Subscribed and sworn to before me this __15__ day of October, 2019.

_____
Hon. Linda Lopez
United States Magistrate Judge